UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

EMERALD COAST UTILITIES
AUTHORITY,

     **Plaintiff,**

v.                           **Case No. 3:20cv5986/MCR/ZCB**

AMERICAN CAST IRON PIPE
COMPANY; VULCAN PIPE & STEEL
COATINGS, INC.; and INDURON
COATINGS, LLC,

     **Defendants.**

_____/

## ORDER

This matter is before the Court on motions for summary judgment filed by

Defendants American Cast Iron Pipe Company and Induron Coatings, LLC. *See*

ECF Nos. 70, 72.[1]

## I.    Background[2]

This action involves a dispute over the alleged premature corrosion and failure

of ductile iron pipe internally lined with a ceramic epoxy called "Protecto 401"

---

[1] The Court previously ruled on the parties' respective motions to exclude expert testimony and opinions under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and American's motion for partial summary judgment. *See* Order, ECF No. 94.

[2] Most of the relevant facts were detailed in a prior Order. *See id.* at 1-5. The Court now restates and supplements many of those same facts to correspond with new issues presented in the instant motions.

("P401"), which was used in two sewer pipeline construction projects commissioned by Plaintiff Emerald Coast Utilities Authority ("ECUA") in Escambia County, Florida.  Defendant American Cast Iron Pipe Company ("American") manufactured the unlined ductile iron pipes used in the two projects, Defendant Induron Coatings, LLC ("Induron") manufactured the P401 coating, and Defendant Vulcan Pipe and Steel Coatings, Inc. ("Vulcan") applied Induron's P401 coating to American's pipes.[3]  ECUA alleges that, due to each defendant's negligence, the P401 coating failed to adequately protect the interior metal surfaces of both sewer pipelines, resulting in leaks and/or corrosion, and also that the defendants misrepresented the quality and fitness of P401-lined pipes, which ECUA relied on to its detriment in selecting them for use in the projects.  The facts relevant to the instant motions, construed in the light most favorable to ECUA, the non-moving party, are as follows.[4]

ECUA operates the sewer system in Escambia County, Florida.  In early 2006, ECUA began the process of upgrading Escambia County's sewer system by, among other things, building a new sewer plant and associated pipelines.  As relevant to the

---

[3] Defendant Vulcan and ECUA have settled the claims against Vulcan.  *See* Notice of Settlement, ECF No. 57.  American and Induron will be referred to collectively in this Order as "Defendants."

[4] At the summary judgment stage, a court must construe the facts in the light most favorable to the non-moving party.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990); *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1455 (11th Cir. 1997).  All disputed facts must be resolved in the non-movant's favor, and all reasonable inferences arising from those facts must be drawn in its favor.  *Id.*

instant motion, ECUA contracted with Utility Service Co., Inc. ("USC") to construct one of the pipelines (known as the Blue Angel Project), and procured ductile iron pipe for that project from Defendants through USC.[5]  *See* Second Amended Complaint, ECF No. 38 at ¶ 11.

ECUA's original specifications called for the use of PVC pipe in the projects. That changed, however, after a series of in-person meetings and phone calls between ECUA and representatives for Defendants.  More specifically, ECUA's design engineers provided American with the plans and specifications for the pipeline projects, *see* William Carter Dep., ECF No. 80-1 at 29, and met with representatives of all three defendants for site visits in Birmingham, Alabama.  While there, ECUA received presentations and promotional materials from Defendants about the attributes and quality of P401-lined ductile iron pipes for "tough" domestic sewer applications.  *See* ECUA Am. Interrog. Resp., ECF No. 69-1 at 3.  According to ECUA, its representatives also discussed with Defendants their "primary concerns" regarding P401-lined ductile iron pipe; namely, whether it could handle the "extreme[]" levels of corrosivity expected to exist in ECUA's pipelines.  *See* Patrick Byrne Aff., ECF No. 88-2 at 3-5.  In response—again, according to ECUA—both

---

[5] Utility Service Co., Inc. was contracted to construct a pipeline known as the Blue Angel Force Main Replacement.  Morgan Contracting, Inc. was contracted to construct a second pipeline, known as Central Water Reclamation Facility Government Street Regional Lift Station & Regional Lift Station B.

American and Induron assured ECUA that the product would withstand the anticipated levels of corrosivity and was suitable for ECUA's particular project specifications. *See id*. This information "convinced ECUA that P401-lined ductile iron pipe would be suitable for" its current domestic sewer projects, as well as for others in the future. *See* Bruce Neu Affidavit, ECF No. 59-2 at 4. Soon thereafter, American contacted ECUA directly to request that the project specifications be modified to allow for the use of P401-lined ductile iron pipe "as a reasonable and practical additive alternate" for PVC pipe. *See id*. The modification was subsequently approved, *id*., and inserted into the project specifications as an addendum, *see* Blue Angel Project Plans Addendum 1, ECF No. 59-1 at 10.

Consistent with ECUA's project specifications, USC contracted with American to obtain the P401-lined ductile iron pipe "on behalf of and at the direction of ECUA" in early 2008. *See* ECUA Response, ECF No. 59 at 4. As agreed, American manufactured ECUA's ductile iron pipes, Induron produced the P401 coating, and Vulcan applied the P401-coating to the interior metal surfaces of the pipes, which were then delivered to USC and used in the construction of ECUA's domestic sewer pipelines.[6] The Blue Angel pipeline went into service later that same

---

[6] Each "batch" of P401 produced by Induron had two components—the epoxy resin and an activator—that were shipped together to Vulcan. *See* White 30(b)(6), ECF No. 71-1 at 5, 10-11. Vulcan mixed the epoxy and the activator, then applied the mixture to the subject pipes. *See* id. at 14-17. There is no evidence or argument in this case, at least not in connection with the instant motions, that the P401 was applied improperly.

year, *see* Nixon Dep., ECF No. 68-1 at 39, 44 & 47, and the alleged premature corrosion and failure of various sections of that pipeline was discovered in January 2017, *see id*. at 47.  This suit followed.

ECUA's complaint asserts four claims against American and Induron: negligence, negligent misrepresentation, breach of implied warranty of merchantability, and breach of implied warranty of fitness for a particular purpose.[7] The Court has already granted American's motion for partial summary judgment on the implied warranty claims.  American now moves for summary judgment on ECUA's negligent manufacturing and negligent misrepresentation claims, and Induron moves for summary judgment on all claims.

## II.   Legal Standard

Summary judgment is appropriate where the record reflects there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is "material" if, under the applicable substantive law, it might affect the outcome of the case.  *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  A dispute of fact is "genuine" if "the evidence is

---

[7] Again, the claims against Vulcan have been settled.  *See* Notice of Settlement, ECF No. 57.

such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 840 (11th Cir. 2000) (citing *Celotex*, 477 U.S. at 323). Once that burden is met, the nonmoving party must "go beyond the pleadings" and present competent record evidence showing the existence of a genuine, material factual dispute for trial. *Celotex*, 477 U.S. at 324. In doing so, and to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 252. In assessing whether a movant is entitled to summary judgment, a court must view the evidence and factual inferences drawn therefrom in the light most favorable to the non-moving party. *See id.* at 255; *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). Ultimately, summary judgment must be entered where "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex*, 477 U.S. at 323.

## III.    Discussion

Both defendants seek summary judgment on ECUA's claims for negligent manufacturing and negligent misrepresentation, and Induron separately seeks summary judgment on the implied warranty claims.

### A.    Negligent Manufacturing (*Counts I & III*)

ECUA alleges that American negligently manufactured the subject ductile iron pipes, and Induron negligently manufactured the P401 coating, which resulted in biogenic sulfide corrosion and leaks in ECUA's domestic wastewater pipeline. These claims fail as a matter of law for a fairly fundamental reason.  A claim for negligent manufacturing under Florida law requires evidence of a defect in the subject product.  *See Savage v. Danek Med., Inc.*, 31 F. Supp. 2d 980, 983 (M.D. Fla. 1999); *Humphreys v. Gen. Motors Corp.*, 839 F. Supp. 822 (N.D. Fla. 1993).  In the case of alleged latent defects, as here, that evidence must be in the form of expert testimony.  *See Citizens Prop. Ins. Corp. v. Simkar LLC*, 813 F. Supp. 2d 1356, 1362 (M.D. Fla. 2011); *Humphreys*, 839 F. Supp. at 826-27.  ECUA has offered no evidence—expert or otherwise—that either American's unlined ductile iron pipes, Induron's P401 coating, or the finished P401-lined pipes were defective.  To the contrary, ECUA's own expert, Robert Nixon, testified that there is no "data to support" a conclusion that a manufacturing defect existed in the P401 coating or the ductile iron pipes.  *See* Nixon Dep., ECF No. 68-1 at 92, 123, 191.

Essentially conceding the absence of direct evidence of a defect, ECUA instead offers a *res ipsa loquitur* argument that the pipe failures in this case "could not have occurred" in the absence of a manufacturing defect.  More specifically, ECUA argues that it is entitled to a rebuttable inference of manufacturing negligence because: (1) Defendants claim P401 lining has been proven to successfully protect against corrosion in laboratory testing and "hundreds" of domestic sewer applications; (2) the P401 here failed to protect against corrosion in ECUA's domestic sewer pipelines; (3) Induron had control of the subject P401 until the P401-lined pipes were "handed off to" ECUA; and (4) ECUA has "adequately refuted" any reasonable alternative theories as to potential causes for the P401 failures while in ECUA's control.  *See* ECUA Response to Induron, ECF No. 88 at 16-17.  This is incorrect.

The doctrine of *res ipsa loquitur* is an evidentiary "doctrine of extremely limited applicability" that permits a rebuttable inference of negligence in the absence of direct proof of negligence where a plaintiff first establishes that: (1) the product at issue was within the exclusive control of the defendant at the time of the injury, both as to operation and inspection; and (2) the injury-producing event is of a type that ordinarily does not occur in the absence of negligence by the one in control.[8]

---

[8] Florida's intermediate appellate courts also "have long recognized as an essential element of the doctrine of *res ipsa loquitur* that the injury may not be the result of any voluntary action or

*See Otis Elevator Co. v. Chambliss*, 511 So. 2d 412, 413-14 (Fla. 1st DCA 1987) (citing *Goodyear Tire & Rubber Co. v. Hughes Supply, Inc*., 358 So.2d 1339 (Fla. 1978)); *Holman v. Ford Motor Co*., 239 So. 2d 40, 44 (Fla. 1st DCA 1970). ECUA has not satisfied even the first element of this standard.

Briefly, it is undisputed that the P401-lined ductile iron pipe at issue here was not within Defendants' exclusive control or responsibility at the time of the corrosion failures, and had not been for more than seven years. Indeed, once the subject pipes were delivered to ECUA in 2008, Defendants had no further contact or involvement with them until the first failures began in 2015. In the interim, the pipes were installed in ECUA's domestic sewer system by a government contractor and, for years thereafter, the pipes transported municipal sewage through inherently corrosive internal environmental conditions to a wastewater treatment facility. Defendants did not design, install, operate, inspect, repair, or perform maintenance on ECUA's sewer system. Thus, on this record, there is no evidence to support a finding that Defendants had *any* control or responsibility for the subject pipes after ECUA took delivery of them in 2008. Only ECUA and/or its agents did. ECUA's attempted invocation of *res ipsa loquitur* fails on this basis. *See, e.g*., *Goodyear Tire*, 353 So. 2d at  (exclusive control requirement not met in tire blowout cases

---

contribution on the part of the plaintiff." *See Otis Elevator Co. v. Chambliss*, 511 So. 2d 412, 414 n.5 (Fla. 1st DCA 1987) (collecting cases). This element is not at issue here.

where blowout occurred after allegedly defective tire had been in plaintiff's possession and control for one month, and had been driven 9,000 miles).

ECUA also has failed to satisfy the second requirement of the *res ipsa* standard because it has not established that an injury-producing event of the kind alleged in this case—*i.e.*, corrosion of the interior metal surfaces of a domestic sewer pipeline—would not, in the ordinary course of events, occur in the absence of a manufacturing defect. *See Goodyear Tire*, 358 So. 2d at 1341-42. *Res ipsa loquitur* presupposes that an event would not have happened "but for" a manufacturing defect. *See McDougald v. Perry*, 716 So. 2d 783, 785 (Fla. 1998). While this standard does not require a plaintiff to "eliminate with certainty all other possible causes" of its injury, there must be "evidence from which a reasonable person can say that on the whole it is more likely [than not that]" manufacturing negligence was involved. *See id.* at 786; *Goodyear*, 358 So. 2d at 1341 (plaintiff must "establish that the circumstances attendant to the injury are such that…negligence is the probable cause and the defendant is the probable actor"). Expert evidence on the issue is typically required, except in "rare instances" where the underlying facts "in and of themselves" establish "but for" negligence as a matter of "common sense" and "human experience." *See McDougald*, 716 So. 2d at 785-86 (explaining common sense understanding that trains generally do not derail, elevators do not freefall, and boilers do not explode, absent negligence).

In this case, there can be no reasonable dispute that the causes of biogenic sulfide corrosion failures in a domestic wastewater pipeline are beyond the common sense and experience of the average lay juror (and the average federal court, for that matter). Those sorts of determinations require an understanding of the interrelationship between the potential corrosive effects of domestic sewage, the chemical environment within a particular pipeline, and the performance capacity of the protective pipe coating. And often even a thorough understanding of the relevant factors is not enough. As the instant evidentiary record demonstrates, seasoned domestic wastewater industry professionals, including chemists and technical engineers, routinely struggle to identify the cause of specific corrosion failures.[9] Consequently, corrosion failures do not fall within the "rare instances" where the facts, in and of themselves, bespeak negligence as a matter of common knowledge, sense, and experience. *See id*. at 785. Rather, expert testimony is necessary to explain how and why the failures could not have occurred but for manufacturing negligence, particularly given the expert evidence from both sides agreeing that biogenic sulfide corrosion can be caused abnormally aggressive environmental conditions inside a pipeline alone.[10] It is undisputed that ECUA has not offered any

---

[9] *See, e.g.*, Order dated March 29, 2003, ECF No. 94 at 16 & n.8 (discussing American, Induron, and/or independent third-party labs' inability to definitively determine cause of corrosion failures in Sarasota, Florida; Columbus, Georgia; Carrboro, North Carolina; and Kissimmee, Florida).

[10] *Compare* Paschke Rep., ECF No. 86 at 17-18 (describing conditions known to promote an "abnormally corrosive environment" inside a wastewater pipeline), *with* Nixon Rebuttal, ECF

such testimony.  To the contrary, and as already discussed, ECUA's own expert, Robert Nixon, testified there is no "data to support" a conclusion that manufacturing negligence was involved here.  *See* Nixon Dep., ECF No. 68-1 at 92, 123, 191. Because there is no expert evidence or "fund of common knowledge" that would enable lay jurors to reasonably infer negligence from the mere fact of the corrosion failures, *see McDougald*, 716 So. 2d at 786, ECUA has not satisfied the second requirement of the *res ipsa* standard.

In sum, the Court finds ECUA has not provided competent evidence of the existence of a manufacturing defect, or of its entitlement to a rebuttal inference of manufacturing negligence under the doctrine of *res ipsa loquitur*.  Thus, there are no genuine disputes of material fact, and Defendants are entitled to judgment as a matter of law, on ECUA's negligent manufacturing claims.

### B.    Negligent Misrepresentation (*Counts IV & VI*)

ECUA asserts negligent misrepresentation claims against both Defendants. Defendants argue summary judgment is proper on grounds that ECUA has not shown the existence of a material misrepresentation by either Induron or American, or justifiable reliance.[11]   The Court disagrees.

---

No. 68-4 at 6 ("completely concur[ring] with" Paschke's description of the conditions that promote biogenic sulfide corrosion in wastewater pipelines); *see also* Nixon Dep., ECF No. 68-1 at 94 (agreeing that certain environmental conditions "do make a [pipeline] more aggressive than it would be" without those conditions).

[11] To establish a negligent misrepresentation claim under Florida law, a party must show: "(1) a misrepresentation of material fact that the defendant believed to be true but which was in

## 1.    Material Misrepresentations

To establish its negligent misrepresentation claims, ECUA first must show "false statements of material fact" by Defendants. *Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc*., 232 So. 3d 502, 505 (Fla. 1st DCA 2017). "A fact is material if, but for the alleged nondisclosure or misrepresentation, the complaining party would not have entered into the transaction." *Atl. Nat'l Bank of Fla. v. Best*, 480 So. 2d 1328, 1332 (Fla. 2d DCA 1985). Unless the facts are undisputed, materiality is a question of fact for a jury. *Id*.

Defendants argue there is no question of fact on materiality because the evidence offered by ECUA in support of this element is either (a) immaterial and non-actionable puffery; or (b) inadmissible because the evidence—more specifically, an affidavit by Patrick Byrne, a former ECUA engineer, who recounts representations alleged made by Defendants regarding the suitability of P401-lined ductile iron pipe for ECUA's pipelines—is in the form of a sham affidavit that must be disregarded because it "directly contradicts" earlier Rule 30(b)(6) deposition testimony given by ECUA's corporate representative, Stacy Hayden. This is incorrect.

---

fact false; (2) that defendant should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely on the misrepresentation; and (4) the plaintiff acted in justifiable reliance upon the misrepresentation, resulting in injury." *Arlington Pebble Creek, LLC v. Campus Edge Condo. Ass'n, Inc*., 232 So. 3d 502, 505 (Fla. 1st DCA 2017). Only the first and fourth elements are at issue in this case.

First, ECUA has presented evidence that Defendants made statements that amounted to more than puffery.  In Florida, sellers "are given some latitude in enhancing the quality or value of their wares" during the sales process.  *See Mfg. Rsch. Corp. v. Greenlee Tool Co.*, 693 F.2d 1037, 1040 (11th Cir. 1982). Expressions of opinion made to "puff" a product generally "are not actionable in misrepresentation even if untrue on the theory that no reasonable person would rely on general claims of superiority made by a salesman." *Id.*; *see also Mejia v. Jurich*, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001).  However, "where the person expressing the opinion is one having superior knowledge of the subject of the statement and the plaintiff can show that said person knew or should have known from facts in his or her possession that the statement was false, then the opinion may be treated as a statement of fact."  *Id.*  And, of course, "statements misrepresenting a product or falsely ascribing benefits or virtues to a product *are* actionable."  *Id.* at 1041 (emphasis added).

True, several of Defendants' alleged misrepresentations do constitute puffery. For example, statements that P-401 is "gangbusters" against hydrogen sulfide corrosion, *see* Hayden Dep., ECF No. 69-3 at 60-61, or that "[n]othing protects tough sewer pipe applications more effectively than ductile iron pipe and fittings lined with Induron's" P401 ceramic epoxy, *see* ECUA Am. Interrog. Resp., ECF No. 69-1 at 3, are too hyperbolic and/or vague to be considered objective representations of

material fact about the characteristics and capabilities of P401-lined ductile iron pipe. *See MDVIP, Inc. v. Beber*, 222 So. 3d 555, 561-62 (Fla. 4th DCA 2017); *Holmes v. Behr Process Corp.*, No. 2:15cv454, 2015 WL 7252662, at *3 (N.D. Ala. Nov. 17, 2015).[12]   Statements of that nature are not actionable under Florida law. With that said, ECUA's negligent misrepresentation claims also are supported with evidence of factual statements by Defendants ascribing specific and material properties to P401-lined ductile iron pipe during the Birmingham visit.   More specifically, Patrick L. Byrne, a Professional Engineer who participated in the visit on behalf of ECUA, submitted an affidavit ("Byrne affidavit") stating that, while there, the parties "specifically discussed…in detail" one of ECUA's "primary concerns" regarding P401-lined ductile iron pipe, which was "the potential for failures and leaks due to corrosion resulting from potential hydrogen sulfide gas problems[,]" and whether P401 "would be able to handle the anticipated levels of corrosivity[.]"   *See* Byrne Aff., ECF No. 88-2 at 3-4.  According to Byrne, all three defendants represented that P401 "was able to withstand extremely corrosive

---

[12] *See MDVIP, Inc. v. Beber*, 222 So. 3d 555, 561-62 (Fla. 4th DCA 2017) (statements that defendant health care organization would provide "exceptional doctors," "the best hospitals and doctors" and the "finest national specialists" were non-actionable puffery); *Wasser v. Sasoni*, 652 So. 2d 411, 412 (Fla. 3d DCA 1995) (seller's representations that an apartment building was "a very good building requiring normal type of maintenance" and "an excellent deal" were puffing and not fraudulent misrepresentations); *see also Holmes v. Behr Process Corp.*, No. 2:15cv454, 2015 WL 7252662, at *3 (N.D. Ala. Nov. 17, 2015) (applying Alabama law) (salesman's alleged representation that subject product was "a high quality primer suitable for adhering to both plaster and sheetrock/drywall walls and ceilings" was "nothing more than puffery").

environments . . . [,] would be suitable for [ECUA's] particular plans[,] and would withstand the anticipated corrosion" conditions. *Id*. Byrne said that all three defendants also provided "specific technical data and testing" reports to substantiate those representations. *See id*. at 4; *see also* Induron P401 Standards Booklet, ECF No. 88-1 at 201-45. Byrne's affidavit is corroborated by Bruce Neu, a project engineer for the subject pipelines who also attended the Birmingham visit, and who testified that Defendants, including Induron, "marketed" and "represent[ed]" P401 as able to withstand the anticipated high concentrations of biogenic sulfides in ECUA's pipeline. *See* Neu Dep., ECF No. 69-5 at 24-25. Moreover, at least one American sales representative confirmed that "from what little [he] can remember," he did "have discussions with [Byrne] regarding the potentially aggressive nature of [ECUA's] line and the use of P401[-lined ductile iron pipe] to protect it." *See* Carter Dep., ECF No. 59-3 at 16. Based on this evidence, a reasonable jury could conclude that Defendants' statements were more than just puffing, that Defendants specifically knew and understood ECUA's unique domestic wastewater needs and, using their superior knowledge and experience with P401-lined ductile iron pipes, represented that their products would meet those needs. And given Defendants' asserted position in this case—*i.e.*, that P401-lined ductile iron pipe is suitable only for "typical" domestic wastewater applications, as opposed to "overly aggressive" ones, like ECUA's, *see, e.g.*, Jeffers 30(b)(6) Dep., ECF No. 71-2 at 32, 65-66—a

reasonable jury also could conclude that Defendants knew or should have known their representations about the suitability of P401-lined ductile iron pipe for ECUA's pipelines were false. *See N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1225 n.12 (11th Cir. 2008) ("Whether a statement is literally false is a finding of fact."). Taken together, this evidence is more than sufficient to create a question of fact regarding whether Defendants made a false statement of material fact to ECUA. *See Atlantic Nat'l*, 480 So. 2d at 1332.

Perhaps recognizing that the Byrne affidavit would be largely determinative for the negligent misrepresentation claim for summary judgment purposes, Defendants argue that the affidavit should be disregarded as a sham because, in their view, it directly contradicts the Rule 30(b)(6) deposition of ECUA's corporate representative, Stacy Hayden, without a sufficient explanation of the discrepancies. The Court disagrees.

It is true that a party cannot create a genuine dispute of material fact by filing an affidavit that flatly contradicts, without explanation, the affiant's previously given deposition testimony giving "clear answers to unambiguous questions which negate the existence of any genuine issue of material fact." *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657-58 (11th Cir. 1984). When that occurs, a court may disregard the affidavit as a sham manufactured to circumvent summary judgment on an otherwise factually unsupported claim. *See id.*; *see also Tippens v.*

*Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986); *Lane v. Celotex Corp.*, 782 F.2d 1526, 1529 (11th Cir. 1986) (quoting *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 544 (9th Cir. 1975) ("[T]he very object of summary judgment is to separate real and genuine issues from those that are formal or pretended.").   However, not every discrepancy between prior testimony and a subsequent affidavit justifies application of the sham affidavit rule.   An affidavit should not be disregarded if it merely "supplements earlier testimony, presents a variation of testimony, or represents instances of failed memory." *Pashoian v. GTE Directories*, 208 F. Supp. 2d 1293, 1299 (M.D. Fla. 2002) (citing *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir. 1987)).   In those circumstances, any inconsistencies would create issues of credibility and weight of the evidence that require resolution by the trier of fact.   *See Tippens*, 805 F.2d at 953-54.[13]   Only an affidavit that is "inherently irreconcilable" with an affiant's earlier testimony may be disregarded.   *See id*. at 954 & n.6.

Applying those principles here, Defendants' sham affidavit argument fails for two reasons.   First, while the Court may reject a witness's affidavit where it directly contradicts that *same* witness's prior deposition testimony, the same is not true of an

---

[13] *Tippens v. Celotex Corp.*, 805 F.2d 949, 953-54 (11th Cir. 1986) ("To allow every failure of memory or variation in a witness's testimony to be disregarded as a sham would require far too much from lay witnesses and would deprive the trier of fact of the traditional opportunity to determine which point in time and with which words the witness (in this case, the affiant) was stating the truth.").

affidavit that allegedly contradicts *another* witness's deposition.  *See Ward v. City of Birmingham*, No. 2:12cv257, 2013 WL 541429, at *9 (N.D. Ala. Feb. 8, 2013); *Duvall Chems. v. Osterman & Co., Inc*., No. 4:04cv059, 2006 WL 6848733, at *2 (N.D. Ga. Mar. 14, 2006).  As the Ninth Circuit observed,

> [t]he rationale underlying the sham affidavit rule is that a party ought not be allowed to manufacture a bogus dispute with *himself* to defeat summary judgment.  That concern does not necessarily apply when the dispute comes from the sworn deposition testimony of another witness.

*Nelson v. City of Davis*, 571 F.3d 924, 928 (9th Cir. 2009); *see also McCall v. Houston Cnty.*, 2014 WL 3045552, at *3 n.8 (M.D. Ala. July 3, 2014) ("To reject an affidavit [that contradicts another witness's deposition] would amount to nothing more than the judgment that one witness is credible and the other is not; it is elementary that such determinations are inappropriate at summary judgment."); *Ward*, 2013 WL 541429, at *9; *Duval Chems.*, 2006 WL 6848733, at *2.  Here, because Induron does not claim that Byrne testified in contradiction to his *own* affidavit—and instead claims only that the affidavit allegedly contradicts the testimony of *another* witness, Stacy Hayden—the sham affidavit rule is inapplicable.

Even assuming the sham affidavit rule applied in this context, however, Induron's argument would fail on the merits because there is no contradiction or inherent inconsistency between Hayden's deposition testimony and the Byrne affidavit.  Hayden, as ECUA's corporate representative, testified that he was not present at the Birmingham visit and did not personally know the specific content of

representations made to ECUA there.  *See* Hayden Dep., ECF No. 69-3 at 188-93. However, Hayden also identified the ECUA staff members who were present (including Byrne) and testified that he understood from them that Defendants gave presentations on the suitability of P401-lined ductile iron pipe for ECUA's domestic wastewater needs, and provided brochures and other technical data to substantiate its representations that P401 would protect ECUA's system from hydrogen sulfide corrosion for the anticipated 100-year life of the pipe.  *See* Hayden Dep., ECF No. 69-3 at 17-18, 22-24, 42-43, 60-61.   The Byrne affidavit does not contradict Hayden's testimony.   Rather, it supplies the details that Hayden was unable to provide himself—that is, it recounts Defendants' alleged specific representations and describes the precise documentary materials about P401-lined ductile iron pipe that were provided to ECUA at the Birmingham visit—based on the firsthand knowledge of a witness, Byrne, who was in personal attendance.  Because the Byrne affidavit merely supplements Hayden's testimony, and its contents are readily reconcilable with that testimony, it cannot be disregarded as a sham under applicable law.  *See Pashoian*, 208 F. Supp. 2d at 1299 (citing *Rollins*, 833 F.2d at 1530).  And, as the Court has already found, the entirety of the record evidence raises genuine disputes of material fact on the first element of ECUA's negligent misrepresentation claims.

In short, Defendants' puffery and sham affidavit arguments fail as a matter of Florida and federal law, respectively.  Therefore, summary judgment on those grounds is denied.

### 2.   Justifiable Reliance

Defendants also argue ECUA cannot satisfy the justifiable reliance element of its negligent misrepresentation claim because there is no evidence that ECUA relied solely on Defendants' representations or even at all.  This argument is readily rejected.  There is no requirement that a plaintiff's reliance on a defendant's alleged misrepresentations be the "sole or even the predominant cause of [the plaintiff's] decision to purchase [a product]" so long as the plaintiff's "reliance is a substantial factor in determining the course of conduct that results in his loss*." Specialty Marine & Indus. Supplies, Inc. v. Venus*, 66 So. 3d 306, 311 (Fla. 1st DCA 2011).  ECUA has offered evidence that it sought and relied on Defendants' recommendations about the suitability of P401-lined ductile iron pipe for its domestic wastewater pipeline needs.  *See, e.g.*, Hayden Dep., ECF No. 69-3 at 17-23; (testifying that ECUA staff relied on "all the information that was provided" by American and Induron's "technical" and "sales folks" in selecting P401-lined ductile iron pipe); Neu Dep., ECF No. 69-5 at 106-13 (explaining that Defendants' presentations at the Birmingham visit persuaded ECUA representatives that P401-lined ductile iron pipe would protect ECUA's pipeline from corrosion); Byrne Affidavit, ECF No. 88-2

(detailing Defendants' specific representations that "convinced ECUA that the P401-lined [ductile iron pipe] would be suitable for] ECUA's wastewater pipeline projects).  The record also reflects that ECUA independently investigated the relative merits of using P401-lined ductile iron pipe versus alternatives and confirmed that the former was an "industry standard" with "decades" of use in sewer applications.  *See, e.g.*, Neu Dep., ECF No. 73-2 at 8-11.  There is no evidence or even argument that ECUA reasonably could have discovered that P401-lined ductile iron pipe was not appropriate for the anticipated aggressiveness of its sewers, although even if there were such evidence, that fact might implicate comparative negligence principles but it would not doom ECUA's negligent misrepresentation claims.  *See Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 335 (Fla. 1997) (holding that principles of comparative negligence apply in negligent misrepresentation cases and recipients of information are responsible for "investigating information that a reasonable person in the position of the recipient would be expected to investigate"); *Specialty Marine*, 66 So. 3d at 311 (affirming jury finding both that plaintiff justifiably relied and that defendant's misrepresentations were the cause of only 90% of the plaintiff's damages); *Newbern v. Mansbach*, 777 So. 2d 1044, 1046 (Fla. 1st DCA 2001) ("*Gilchrist* in no way suggests that a cause of action may be precluded as a matter of law based on the trial court's determination that a plaintiff reasonably could have discovered the information and/or that such information is part of public

record.").  Based on the totality of the foregoing evidence, a reasonable factfinder could find that ECUA justifiably relied on Defendants' alleged misrepresentations. *See Specialty Marine*, 66 So. 3d at 311 ("It is for the jury to determine whether reliance was justified under the totality of circumstances.").  Accordingly, summary judgment on justifiable reliance grounds is denied.

### C.   Implied Warranties—Induron (*Counts IX & XII*)

Induron moves for summary judgment on ECUA's implied warranty claims on three grounds.  First, Induron argues that ECUA lacks privity with Induron because it did not purchase P401 directly from Induron and it is not a third-party beneficiary under any P401 sales contract with Induron.  Second, Induron argues Florida law bars implied warranty claims by remote purchasers against upstream component part manufacturers who are not in privity.  Last, Induron ECUA has not shown that Induron intended or directed ECUA to use P401 in a peculiar or unusual manner, rather it was used for its ordinary purpose.

#### 1.   Privity

The Court begins with the issue of privity.  As discussed in a prior Order, ECF No. 94, privity may arise under Florida law where: (1) the plaintiff purchased a product directly from the defendant; (2) the plaintiff is a third-party beneficiary of a contract to which the defendant is a party; or (3) the defendant made direct assurances to, or otherwise directly engaged with, a plaintiff-buyer who purchased

from a third-party.  *See, e.g.*, *Padilla v. Porsche Cars N. Am., Inc*., 391 F. Supp. 3d 1108, 1116 (S.D. Fla. 2019) (collecting cases).  ECUA did not purchase P401 directly from Induron and, in connection with the instant briefing at least, it offered no *evidence* to support a finding that it has third-party beneficiary status under any sales contract(s) for the P401 used in its projects.[14]  However, ECUA has provided evidence that it had direct discussions with, and received direct representations from, at least one Induron representative about the suitability of P401-lined pipes for its anticipated domestic wastewater needs, during the Birmingham visit.  As already discussed, Patrick L. Byrne, a Professional Engineer who participated in the visit on behalf of ECUA, submitted an affidavit stating that the parties "specifically discussed … in detail" one of ECUA's "primary concerns" regarding P401-lined ductile iron pipe, which was "the potential for failures and leaks due to corrosion resulting from potential hydrogen sulfide gas problems[,]" and whether P401 "would be able to handle the anticipated levels of corrosivity[.]"  *See* Byrne Aff., ECF No. 88-2 at 3-4.  According to Byrne, Induron (as well as the other two defendants) represented that P401 "was able to withstand extremely corrosive environments…[,] would be suitable for [ECUA's] particular plans[,] and would withstand the

---

[14] *Compare* ECUA Response to American First MSJ, ECF No. 59 at 4 (conceding that ECUA's contractor purchased P401-lined ductile iron pipe from American "*on behalf of and at the direction of ECUA*") (emphasis in original), *with* ECUA Response to Induron MSJ, ECF No. 88 at 33-35 (asserting ECUA's implied warranty claims are covered under Florida's third-party beneficiary laws but citing no evidence to support the assertion).

anticipated corrosion" conditions. *Id*. Byrne said that all three defendants also provided "specific technical data and testing" reports to substantiate their representations. *See id*. at 4; *see also* Induron P401 Standards Booklet, ECF No. 88-1 at 201-45. Included among the data from Induron was a P401 case history from a sewer system in South Florida, complete with pictures, in which "severe" corrosive conditions "destroyed" the PVC-lined concrete walls of the pipeline (as well as various flanges and fittings) but the P401-lined portions of ductile iron pipe remained unscathed. *See* P401 Case History, ECF No. 88-1 at 188-89. Byrne's affidavit is corroborated by Bruce Neu, a project engineer for the subject pipelines who also attended the Birmingham visit, who testified that Defendants, including Induron, "marketed" and "represent[ed]" P401 as able to withstand the anticipated high concentrations of biogenic sulfides in ECUA's pipelines. *See* Neu Dep., ECF No. 69-5 at 24-25. On the whole, this evidence is more than sufficient to create a triable dispute of material fact as to whether Induron—based on its direct contacts and representations to ECUA—was in privity with ECUA. *See Global Quest, LLC v. Horizon Yachts, Inc.*, 849 F.3d 1022, 1032 (11th Cir. 2017) (applying Florida law); *ISK Biotech Corp. v. Douberly*, 640 So. 2d 85 (Fla. 1st DCA 1994) (finding privity where manufacturer's representative told third-party seller to assure plaintiff that product would not destroy plaintiff's crop); *Cedars of Lebanon Hosp. Corp. v. European X-Ray Distrib. of Am., Inc.*, 444 So. 2d 1068, 1072 (Fla. 3d DCA 1984)

(finding privity where manufacturer's representative made express warranty through direct contacts with the purchaser who bought product from third-party distributor).

## 2. Upstream Component Part Manufacturers

Induron next argues that "downstream" purchasers of a final product, like ECUA, are barred from asserting breach of implied warranty claims against "upstream" (or "remote") component part manufacturers, like Induron, under Florida law. The Court disagrees. As the cases cited by Induron make clear, Florida's Uniform Commercial Code only bars a purchaser's implied warranty claim against a remote component part manufacturer with whom the purchaser *lacks privity*. *See, e.g.*, *Favors v. Firestone Tire & Rubber Co.*, 309 So. 2d 69, 73 (Fla. 4th DCA 1975); *Schuessler v. Coca-Cola Bottling Co. of Miami*, 279 So. 2d 901, 903-04 (Fla. 4th DCA 1973); *see also Safranek v. Wal-Mart Stores, Inc.*, No. 0:07cv61533, 2009 WL 10668141, at *3 (S.D. Fla. Mar. 24, 2009). Here, the Court has already found the record evidence more than sufficient to create a triable dispute of material fact as to whether Induron and ECUA were in privity for implied warranty purposes. Resolution of that dispute of fact at trial will determine whether the "remote" manufacturer rule applies in this case; therefore, summary judgment is not appropriate on this ground.

### 3.      Fitness for a Particular Purpose

Induron argues summary judgment should be granted on ECUA's implied warranty of fitness for a particular purpose claim because ECUA has not shown that "Induron intended or directed ECUA to use [P401] in a peculiar or unusual manner[.]"  *See* Induron Mot., ECF No. 70 at 39-41.  Again, the Court disagrees.

The warranty protections of Fla. Stat. § 672.315 (fitness for a particular purpose) arise where "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."  *See also Royal Typewriter Co., a Div. of Litton Bus. Sys., Inc. v. Xerographic Supplies Corp*., 719 F.2d 1092, 1100 (11th Cir. 1983) (applying Fla. Stat. § 672.315).

> A 'particular purpose' differs from an ordinary purpose in that it envisages a specific use by the buyer which is peculiar to the nature of the business whereas the ordinary purposes for which goods are used are those envisaged in the concept of merchantability and go to the uses which are customarily made of the goods in question.

*See* Off. Comment 2 to Fla. Stat. § 672.315; *Royal Typewriter*, 719 F.2d at 1100. So, for example, whereas "shoes are generally used for the purpose of walking upon ordinary ground," such that the implied warranty of merchantability applies, "a seller may know that a particular pair was selected to be used for climbing mountains," in which case the implied warranty of fitness for a particular purpose applies.  Off. Comment 2 to Fla. Stat. § 672.315.  The existence or nonexistence of a warranty of

fitness for a particular purpose "must and necessarily…depend[s]" on whether the buyer relied on his own judgment at the time of purchase, or instead, the skill and judgment of the seller, and "this is question of fact to be determined by a jury." *Smith v. Burdine's, Inc.*, 198 So. 223, 229 (Fla. 1940); Off. Comment 2 to Fla. Stat. § 672.315; *see also Green v. Am. Tobacco Co.*, 304 F.2d 70, 73 (5th Cir. 1962) (applying Florida law and quoting *Smith*, 198 So. at 229);[15] *Masforce Eur., BVBA v. Mastry Marine & Indus. Design, Inc.*, No. 8:11cv1814, 2013 WL 12156533, at *14 (M.D. Fla. Oct. 24, 2013) (same).

Defendants' own position regarding the facts and evidence again defeats their arguments in favor of summary judgment.  Induron (and American) have offered evidence and argued at length that P401 is suitable only for "typical" domestic wastewater applications, and not "overly aggressive" ones, like ECUA's.  *See, e.g.*, Jeffers 30(b)(6), ECF No. 71-2 at 32, 65-66.  Logically speaking, one cannot insist that ECUA's domestic wastewater pipeline conditions were atypical and extraordinarily aggressive while also maintaining that ECUA's P401-lined ductile iron pipes were only ever put to their ordinary and customary use for implied warranty purposes.  In any event, the Court has already found that ECUA has produced sufficient evidence to create a jury question on the issue of whether : (1)

---

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Defendants specifically knew and understood the anticipated aggressiveness of ECUA's sewer conditions and, using their superior knowledge and experience with P401-lined ductile iron pipes, nonetheless represented that their product would protect against biogenic sulfide corrosion and leaks; and (2) ECUA relied on Defendants' skill and judgment in selecting P401-lined ductile iron pipes for its pipeline projects.  This evidence is sufficient to establish a genuine dispute of material fact on ECUA's implied warranty of fitness for a particular purpose claim.

Accordingly, the motions for summary judgment filed by Defendants American, ECF No. 72, and Induron, ECF No. 70, are **GRANTED IN PART and DENIED IN PART**, as follows:

1.  Summary judgment is granted in Defendants' favor on ECUA's negligent manufacturing claims (*Counts I & III*).

2.  Summary judgment is denied in all other respects (*Counts IV, VI, IX & XII*).

3.  In order to assist the Court in effectively managing its calendar, counsel are directed to confer personally and notify the Court in writing, within seven days, of the expected length of the trial and whether this case will be tried by judge or jury.  Trial will be scheduled by separate order.

4.  The docket indicates that the parties have not engaged in mediation since February 2022.  Therefore, this matter will be referred for a settlement conference with a magistrate judge by separate order.

**SO ORDERED**, on this 10th day of July, 2023.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**